# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION

## AAA No. 01-18-0001-7723

In the Matter of Arbitration between:

**Aramark Uniform Services**

-and-

**Teamsters - Local 25**

Grievance: Unjust Termination – Dave Lavallee

## INTRODUCTION

On September 13, 2018, an arbitration hearing was convened in the offices of Teamsters Local 25 (herein, the "Union") in Charlestown Massachusetts. The dispute involved a grievance filed by the Union on behalf of Dave Lavallee (herein, the "grievant") on April 20, 2018, alleging that the grievant was unjustly terminated by Aramark Uniform Services (herein, the "Employer" or the "Company").

Representing the Union at the hearing was Local 25 Business Agent Andrew Walsh. Representing the Employer was Attorney Ross Friedman of Morgan Lewis, Chicago, IL.

The parties offered the testimony of three witnesses and introduced a total of eleven (11) exhibits. Each party elected to submit a post-hearing brief in lieu of closing arguments. The briefs were received by the American Arbitration Association (herein, "AAA") on October 17, 2018 and the hearing was declared closed.

1

## ISSUE

Did the Employer have just cause to terminate the employment of Dave Lavallee, the grievant? If not, what shall be the remedy?

## THE COLLECTIVE BARGAINING AGREEMENT

### Article 11 – Discipline

"11.1 <u>Suspension or Discharge</u>

The Employer shall not discharge nor suspend any employee without just cause."

"11.2 <u>Warning Notice</u>

In respect to discharge, and/or suspension, the Employer must give at least one (1) warning notice of the specific complaint against such employee in writing . . . except that no prior notice is required when the termination is due to dishonesty . . ."

### Article 30 – Management Rights

"30.1 The management of the Employer's operations and the direction of the working forces, including but not limited to . . . the right to make rules and regulations not inconsistent with the provisions of this Agreement, and to hire, suspend, transfer, discharge for proper cause . . . are vested exclusively in the Employer."

## FINDINGS OF FACT

The evidence determined by the arbitrator to be credible and relevant is summarized below.

The Employer and the Union are parties to a collective bargaining agreement (herein, the "CBA") that became effective on July 12, 2012 and expired on July 11,

2

2018. In accordance with the CBA, the Union represents Route Sales Representatives ("RSR") employed by the Company at its service center in Lawrence, MA. At the time of his termination, the grievant worked for the Company as an RSR. He had been an employee for 21 years.

The Company provides rental and leasing services for uniforms, mats, towels and other products to customers nationwide. The Lawrence facility has two main functions – laundering of dirty towels, uniforms and other apparel – and the delivery, pickup and sale of those items. The RSRs deliver newly laundered products to customers and pick up the products after they are used by the customer. They also serve as sales people. Approximately 24 RSRs work out of the Lawrence facility.

The Company considers inventory to be an important element of their business and depends on its RSRs to track lost and ruined ("L&R") product so that the customers can be properly charged. The Company delivers scores of towels to customers each week.

In order to track its inventory, the Company requires each RSR to complete an Inventory Review Memo ("IRM") for each customer served by the RSR. In order to ensure that the RSRs are properly accounting for product, the Company conducts periodic audits. One such audit was on-going in March and April of 2018.

There are several "triggers" that lead the Company to conduct an automatic audit of an RSR. An automatic audit is triggered when an RSR "pencil-whips" his IRM, or if a driver falls below 70% of his "loss and ruin goal." As an example of the term "pencil-whip" the Company offered the following: the RSR submits a total count for clean towels on hand, clean delivered towels and soiled towels that adds up to the exact inventory for the customer. When this occurs, the Company considers it to be suspect and conducts an audit of that driver.

On April 5, 2018, the grievant finished his route and returned to the facility.

3

At the time, the Company was conducting audits. The grievant, who also served as shop steward, engaged in a conversation with General Manager A.J. Andrews about the audits. During the conversation, Andrews asked to see the grievant's route book, which contained a summary of his invoices for the day. Mr. Andrews also asked the grievant for his IRMs for the day and found that he had completed two IRMs – one for Accardi Foods and one for Whole Foods. Mr. Andrews found the information to be suspicious and concluded that the IRMs were pencil-whipped, warranting an audit.

Mr. Andrews asked the grievant to retrieve the "ergo" bags that he had dropped in the "cages" earlier. Ergo bags – also called soil bags - contained soiled product picked up from the customers and returned to the facility to be laundered. An RSR is required to tag his ergo bags, so they can be identified by customer, and place them in one of the "cages" at the service center upon his return. The grievant informed Andrews that he didn't remember where he dropped his bags.

Several employees searched for the grievant's missing bags in the area suggested by the grievant – the cages near the dock door. However, they could only locate one bag – a bag of towels labeled as product from Accardi Foods. The grievant's IRM indicated that he had picked up 85 soiled towels from Accardi Foods that day. When Andrews asked the grievant to count the towels, the grievant said there were 85. However, when Plant Manager Aaron True counted the contents of the bag he found only 47 towels.

When asked to produce his soil bag from Whole Foods, the grievant stated that he had picked up the soiled product the previous day – not the day indicated on his IRM.

The grievant was instructed to appear at Mr. Andrews' office with his Union representative. When he arrived, he was informed that he was suspended pending an investigation into the charge that he falsified Company documents. A

4

Disciplinary Notice dated April 5, 2018 was submitted as Union Exhibit No. 2. That notice charged that the grievant turned in "IRM audits to his district manager that were falsified and not done per Aramark Company policy." The notice also alleged that the grievant had been "previously spoken to regarding his inability to follow company policy." The grievant refused to sign the notice.

After an investigation, the Employer terminated the grievant's employment. The Union submitted the instant grievance on April 20, 2018.

In his defense, the grievant offered the following at the arbitration hearing. At the time of his suspension and termination, he was serving as the shop steward at the Lawrence facility. In that role, he had been involved in conflicts with the Company prior to April 5, 2018. In the grievant's opinion, he was targeted by the Company because of his work as a shop steward.

Further, the grievant testified that he had been picking up bags at Whole Foods on Wednesdays rather than Thursdays for ten years because the customer had requested that he do so. In addition, he claimed, he had requested a change to that schedule several years prior to allow him to service Whole Foods on Wednesday. Although, his request was denied, he was told by a manager, Jason Kasaka, to deliver some of the product on Wednesdays.

As to the missing bag from Accardi Foods, the grievant testified that he didn't remember where he had put it. Further, he insisted that he was only joking when he said that he counted 85 towels in the bag that had only 47.

## POSITIONS OF THE PARTIES

### The Employer:

It is the position of the Employer that the CBA allows for summary termination of an employee for dishonesty. Since the grievant falsified documents and lied to the Company to cover it up, his termination was for just cause.

5

The Employer argues that its decision to terminate the grievant met the, so-called, "Seven Tests for Just Cause."

The grievant had notice that falsifying Company documents would result in discipline since he had been terminated four years earlier for the same offense.

Further, the rule against dishonesty is reasonable, the Employer maintains. Article 11 of the CBA dictates that employees are entitled to receive one warning before being suspended or terminated, except in case of dishonesty and several other serious offenses.

The Employer insists that the investigation was conducted fairly and the grievant was offered several opportunities to tell his side of the story. However, the grievant responded to the Employer's questions by saying "I don't know" or "I plead the 5th."

Moreover, the Employer argues, the grievant did not inform his supervisors on April 5th that there was a second bag from Accardi Foods somewhere in the facility. Rather, he first raised that defense at the arbitration hearing.

The Employer denies the there was unequal treatment in this instance. Mr. Andrews offered unopposed testimony that he has terminated every employee that came before him charged with dishonesty.

Finally, it is the Employer's position that the penalty imposed was appropriate in this case. The parties agreed to include language in the CBA making dishonesty grounds for summary termination. The Company contends that there is credible evidence in the record proving the grievant was dishonest: his IRMs were suspicious since they were 100% pencil-whipped; when asked to find the bags he had dropped in the cages minutes earlier, he responded that he didn't remember; and, his Whole Foods IRM was dishonest since, by his own admission, he did not go there at all on April 5th.

It is the position of the Employer that it had just cause to terminate the

6

grievant based upon the above evidence and the grievant's history of dishonesty.

The Union:

The Union argues that the Employer did not have just cause to terminate the grievant in this case.

The Union contends that the grievant was targeted for an audit on April 5, 2018 after he questioned General Manager A. J. Andrews about the need for "loss and ruin" audits being done by the Company. The Union suggests that the Company responded by auditing the grievant to make an example of him.

When the grievant was asked about his route sheets for Whole Foods on that date, he stated that he did half of his Whole Foods stop on Wednesday, although it is a Thursday stop, in order to be more efficient. Further, he explained, former Assistant General Manager Jason Kasaka had suggested he handle the Whole Foods account in this way. The grievant had been handling this account in this fashion for many years without protest from the Company.

As to the discrepancy between the number of bar mops found in the grievant's ergo bag for Accardi Foods (47) and the number he reported on his paperwork (85), the grievant reported that there was a second ergo bag from that account in one of the cages. The grievant testified that there were two locations inside Accardi Foods for ergo bags being returned to the Company. Thus, he usually had two bags from this location. Although he had been servicing this account for many years, the grievant had never been questioned about having two ergo bags until this incident.

Several plant workers searched for the second ergo bag in four cages and found nothing. However, the Union maintains, there were ten cages in that location – several of which were not searched. Since the Company stopped the search without checking all ten cages that the search was incomplete. If the Employer

7

wanted an accurate accounting of bar mops it should have conducted a complete search for the second ergo bag. The Union contends that the grievant did not falsify Company documents.

It is the Union's position that the Employer conducted an unfair and incomplete investigation in a rush to judgement for the purpose of making an example of the grievant. The Union requests that the arbitrator reinstate the grievant with full seniority and benefits; and that the arbitrator retain jurisdiction for the purpose of determining the award to the grievant.

## FINDINGS AND OPINION

The Employer terminated the grievant for dishonesty, i.e. falsifying Company documents, on April 5, 2018. The salient evidence is summarized as follows.

According to an email sent by A.J. Andrews to Alexander Gettler, (See, Joint Exhibit No. 2), the grievant went to the Company's service office on April 5, 2018 and complained to General Manager Andrews about the L&R audits that the Company was conducting. At the time, the grievant was the shop steward at the Company's Lawrence facility. The two continued to discuss this issue as they left the office and walked to the "soil dock." As the grievant continued to complain, Mr. Andrews asked to see his daily route book since he had not checked in. After examining the book, Mr. Andrews decided that it warranted an L&R audit. Since L&R audits require going through the employee's soil bags to confirm that they were counted correctly, Mr. Andrews asked the grievant to help locate his soil bags. The grievant refused to help. However, he directed Andrews to the cages on the back of the dock. Without the grievant's help, several production employees and managers emptied the cages and searched for the missing bags. Only one bag was found.

The grievant was directed by his supervisor to count the towels in the bag. After a perfunctory count, he said that there were 85 towels in the bag. (In Joint Exhibit No. 2, Mr. Andrews reported that the grievant said "76 towels.".)

After the grievant counted the towels, Plant Manager Aaron True did a recount and found only 47 towels in the bag. The grievant's IRM for Accardi Foods for that date indicated that he had delivered 85 clean towels and had picked up 85 soiled towels.

Thereafter, Mr. Andrews asked the grievant about his soil bags from Whole Foods that were never located. The grievant informed Andrews that he had picked up the soiled towels the previous day, April 4th. The grievant's IRM for Whole Foods (Jt. Ex. No. 3) indicated that he had picked up soiled towels on April 5, 2018. When Andrews asked him how he completed an IRM on an account he picked up the day before, the grievant said: "I plead the 5th."

After meeting with the grievant and his Union representative in his office, Mr. Andrews suspended the grievant pending an investigation.

The statement of Assistant General Manger Steven Deveney concerning the events of April 5th was admitted into the record of this proceeding (Joint Exhibit No. 2). According to Deveney, the grievant was asked to explain why there was such a discrepancy between the actual towel count and his IRM. In response, the grievant informed Andrews that there was another bag for Accardi Foods. Mr. Andrews asked the grievant where the missing bags were. The grievant said he did not know.

Also admitted into evidence was a statement submitted by Aaron True, the Plant Manager (Joint Exhibit No. 2). Mr. True's statement also indicates that the grievant claimed there was a second Accardi Bag during the search on April 5th. Neither the second Accardi bag, nor the Whole Foods bags were ever found.

In defending himself at the arbitration hearing, the grievant claimed that he

9

had been doing half of his Whole Foods work on Wednesday – although it was a Thursday stop – for many years without any objection by the Company. He also testified that former Assistant General Manager Jason Kasaka had suggested that he split the job in this manner.

In the opinion of this arbitrator, there is no clear and convincing evidence that the grievant acted dishonestly on April 5, 2018. The only probative evidence that the documents submitted by the grievant on that date were inaccurate was the date on his IRM for Whole Foods. The document indicates that he returned soiled towels to Lawrence on April 5, 2018, while the grievant admitted he actually delivered the towels the day before, pursuant to his established routine of splitting his work at Whole Foods over two days.

The uncontroverted evidence presented at the hearing indicates that the grievant had discussed this practice with a Company manager several years earlier and that the practice was condoned. Thus, there is no evidence in the record in support of the Employer's charge that this practice violated any Company rules.

Further, the issue of whether or not the grievant submitted an inaccurate IRM for his work at Accardi Foods depends on the contents of the missing bag. It is unfortunate that the second bag – claimed by the grievant to hold the missing towels - was never found. However, the mere fact that no second bag was found is not proof of wrongdoing. Without solid evidence that the grievant falsified Company documents, the record here does not support a finding of dishonesty.

The Employer argued that multiple factors support an inference that the grievant was dishonest. Although the grievant may have been charged with dishonesty previously, his record does not constitute evidence that he acted dishonestly on April 5, 2018.

Without a record the includes substantial evidence of probative value to support the charge, I cannot find that the Employer met its burden of proof. The

Employer did not prove that it had just cause to terminate the grievant.

The Employer is directed to reinstate the grievant to his former position, restore his seniority and make him whole for all lost wages and benefits.

I find no compelling reason to retain jurisdiction of this matter.

## AWARD

The Employer did not have just cause to terminate the employment of the grievant, Dave Lavallee.

The Employer is directed to return the grievant to his former position with the Company and to make him whole for all lost wages and benefits.

/s/ Theodore H. O'Brien
Arbitrator

November 14, 2018